**Janet LUCY, Personal Representative of the Estate of Raymond Lucy, Deceased; and Janet Lucy, Dlorah Lucy and Angela Lucy, Individually, Plaintiffs,**

v.

**AMOCO OIL COMPANY, a Maryland corporation, Defendant.**

Civ. A. No. 82–60316.

United States District Court,
E.D. Michigan, S.D.

March 15, 1984.

Richard D. Thomas, Davison, Mich., Jean D. Artman, Michael T. Materna, Gary A. Benjamin, Detroit, Mich., for plaintiffs.

Daniel G. Wyllie, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This case is before the Court on defendant's second motion to dismiss. For the reasons stated herein, the motion is granted in part and denied in part.

The complaint was brought in five counts: wrongful termination of a franchise agreement, in violation of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841; tortious interference with prospective business advantage; intentional infliction of emotional distress; gender discrimination in violation of Title VII of the Civil Rights Act of 1967, 42 U.S.C. § 2000e et seq.; and age and gender discrimination in violation of Michigan's Elliott-Larsen Act, M.C.L.A. 37.2101–.2804. In an order dated June 23, 1983, the Court dismissed all but two of the claims: (1) that for tortious interference with prospective business advantage, insofar as that claim alleged that defendant Amoco had failed to perform an agreement with Raymond Lucy, its franchisee, by which Amoco would purchase certain automobile service equipment from Lucy and allow him to establish a Hickory Farms Smoked Sausage franchise at the leased premises; and (2) that for age and gender discrimination in conducting a real estate transaction brought under Article 5 of the Elliott-Larsen Act.

The instant motion seeks an order of dismissal of the remaining claims in this action.

## FACTS

Taking the facts as stated in the complaint, as we must in this motion to dismiss brought under Fed.R.Civ.P. 12(b)(6), it appears that Raymond Lucy was the franchisee of defendant Amoco, and in this capacity, Lucy operated an automobile service station in Ann Arbor from 1967 until his death in September of 1982. The service station itself, and the land on which it was situated, were owned by Amoco, which leased the premises to Lucy in connection with the franchise agreement. The record discloses that the franchise relationship was not particularly amicable, and that Lucy and Amoco were in frequent disagreement about the prices that Lucy charged for gasoline. Following Lucy's death, Amoco sent a notice of termination of the franchise agreement to Lucy's survivors, his wife and two daughters, who are the plaintiffs in this action. The record reflects that plaintiffs were involved in the day-to-day operation of the service station, although the extent of their participation is unclear at this stage of the case.

## DISCUSSION

### Defendant's Motion to Dismiss Claim for Age and Gender Discrimination in Violation of Elliott-Larsen Act

Plaintiffs have alleged that Amoco's decision to terminate the franchise agreement between itself and Raymond Lucy upon Lucy's death, and its refusal to enter into a similar agreement with plaintiffs, were motivated by a discriminatory animus against plaintiffs as females, and against Angela Lucy because of her youthful age. Plaintiffs argue that Amoco's refusal to renew the lease of real property on which the service station was located because of the gender of the plaintiffs, and because of the youthful age of Angela Lucy, constituted a violation of Article 5 of the Elliott-Larsen

Act.[1] Section 37.2502 of the Act provides in pertinent part as follows:

(1) A person engaging in a real estate transaction, or a real estate broker or salesman, shall not on the basis of religion, race, color, national origin, age, sex, or marital status of a person or a person residing with that person:

(a) Refuse to engage in a real estate transaction with a person.

(b) Discriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith.

(c) Refuse to receive from a person or transmit to a person a bona fide offer to engage in a real estate transaction.

(d) Refuse to negotiate for a real estate transaction with a person.

(e) Represent to a person that real property is not available for inspection, sale, rental, or lease when in fact it is so available, or knowingly fail to bring a property listing to a person's attention, or refuse to permit a person to inspect real property.

(f) Print, circulate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign, or use a form of application for a real estate transaction, which indicates directly or indirectly, an intent to make a preference, limitation, specification, or discrimination with respect thereto.

(g) Offer, solicit, accept, use, or retain a listing of real property with the understanding that a person may be discriminated against in a real estate transaction or in the furnishing of facilities or services in connection therewith.

The preceding definitional provision of Article 5, § 37.2501, reads as follows:

As used in this article:

(a) "Real property" includes a building, structure, mobile home, real estate, land, mobile home park, trailer park, tenement, leasehold, or an interest in a real estate cooperative or condominium.

(b) "Real estate transaction" means the sale, exchange, rental, or lease of real property, or an interest therein.

Despite this broad definition of "real property" and "real estate transaction", defendant argues that Article 5 should be read to prohibit only discrimination in the sale or lease of residential property. Defendant draws this narrow construction of the statutory language by implication from certain provisions of Article 5 other than those quoted *supra*.[2]

The question posed appears to be one of first impression. The Court finds

---

**1.** Plaintiffs have not argued that Amoco's refusal to enter into a franchise relationship with them constituted a violation of Article 3 of the Elliott-Larsen Act, which prohibits discrimination in the provision of goods and services by a place of public accommodation. Such an omission is altogether proper. While a service station is undeniably a place of public accommodation as defined by § 37.2301(a) ("a business ... whose goods, services, facilities ... are extended, offered, sold, or otherwise made available to the public"), Article 3 seeks to regulate only those transactions between such places and the retail purchasers of their goods and services. It does not purport to regulate a transaction such as this one between a manufacturer and one of its franchised distributors, because the products of such a manufacturer, particularly its trademark and tradename, are not "made available to the public".

**2.** In particular, Amoco cites § 37.2103 of the Act, which was amended in 1980 to provide that sexual harassment constituted a form of sexual

discrimination. Subsection (h) of that provision provides that sexual conduct is prohibited when submission to or rejection of such conduct is used as a factor of decisions affecting a person's "employment, public accommodations or public services, education or *housing*," (emphasis added).

Amoco also cites § 37.2503, which creates certain exemptions from the kinds of transactions that are subject to the prohibition against discrimination. These exemptions involve residential property (units with accommodations for not more than two families; units occupied by the owner of the unit; and units established for occupancy of senior citizens).

Finally, Amoco cites § 37.2506, which prohibits representations that the ethnic composition of a neighborhood has or will change for the purpose of including a real estate transaction (the practice colloquially described as "blockbusting").

defendant's arguments on this score unconvincing.[3] First, the plain language of § 37.2501 defines real property as broadly as possible, including all interests in, *inter alia*, "a building, structure ... real estate, land." Such a broad definitional statement simply cannot be read to support defendant's argument that the legislature intended to regulate only transactions involving residential property. As defendant points out, other provisions of the statute specifically use the word "housing".[4] Had the legislature intended to limit the reach of the prohibition against discrimination created by Article 5 to transactions in residential property, it certainly would have done so with similarly restrictive language.

Second, § 37.2102 which sets forth the underlying policy rationale for the Act, states that "The opportunity to obtain employment, housing, *and other real estate*

... without discrimination because of ... age (and) sex ... is recognized to be a civil right," (emphasis supplied). This language clearly evinces a legislative intent to prohibit gender and age discrimination in transactions involving real property other than residential property.

■ Defendant further argues that, assuming that Article 5 prohibits discrimination on the basis of gender and age in transactions involving commercial real property, the statute should not be applied to the instant transaction, because the leasehold provision pertaining to the real property was a minor incident of the franchise agreement. Defendant argues that plaintiffs are seeking far more than a simple leasehold interest in real property owned by the defendant, but rather seek to compel defendant to enter into a franchise

---

**3.** With respect to Amoco's argument that § 37.2103 prohibits sexual harassment in housing, but not in other real estate transactions, the Court concludes that even if this is the case, such a result is not anomalous when juxtaposed to the broader prohibition against other forms of sexual discrimination in all forms of real estate transactions. It is not logically inconsistent for the legislature to determine, in its wisdom, that sexual harassment would be prohibited only in transactions involving residential property, but that all other forms of sexual discrimination would be prohibited with respect to all transactions involving real property, commercial as well as residential. The Court believes that the reference to "housing" in § 37.2103 was in fact a shorthand term for the broader term of "real estate" as used in § 37.2501, and that the legislature probably intended to prohibit sexual harassment in the accomplishment of all real estate transactions. That question, however, is not before the Court. In any event, a narrower term in one of several operational provisions of the statute can not be construed to delimit the broad scope of a definitional provision of the statute when the question presented is the scope of a term expressly defined.

With respect to Amoco's argument that the prohibition against discrimination set forth in § 37.2502 should be limited to transactions involving only residential property because the exemptions to that general prohibition involve only residential property, the Court finds this argument wholly unconvincing. The fact that the legislature has determined that the privacy and associational interests of individuals living in certain kinds of residential property out-

weigh the societal interest in prohibiting discrimination in no way contradicts that legislature's intention of stamping out discrimination in the sale and lease of commercial property. Indeed, the fact that the privacy and associational interests are not so strongly implicated in the sale or lease of commercial real estate permits the legislature to give unfettered force to the prohibition against discrimination with respect to that kind of real property.

Finally, with respect to Amoco's argument that because § 37.2506, which prohibits blockbusting, is directed at the sale of residential property, it follows that the general prohibition should be limited only to transactions involving residential· property, the Court disagrees with the underlying premise. The section by its terms prohibits blockbusting in a "real estate transaction", which presumably refers back to the broad definition of that term provided in § 37.2501. Assuming for the sake of argument that the practice of blockbusting historically has been more prevalent in the marketing of residential as opposed to commercial real estate, it does not follow that blockbusting could not be an effective incentive for "white flight" from commercial property. Especially for owners of small businesses that are particularly susceptible to crime, such as automobile service stations, a representation that the neighborhood may suffer an increase in crime might prove to be a potent inducement for such a person to sell his property. The Court finds that the legislature reasonably could and has in fact prohibited blockbusting with respect to the sale or lease of commercial as well as residential property.

**4.** *See, e.g.* M.C.L.A. 37.2103(h), *supra*.

relationship with them. Defendants correctly point out that a franchise relationship involves a greater degree of cooperation and interdependence than does a typical landlord-tenant relationship. Defendant argues that the selection of a franchisee is akin to the selection of a business partner, and that the Elliott-Larsen Act has not sought to prohibit discrimination in the conduct of this kind of intricate commercial activity.[5] Although the Court agrees that application of Elliott-Larsen's prohibition against discrimination to the decision about whether or not to extend a franchise to a particular person may be more intrusive, and cause greater hardship to the franchisor than does the application of the prohibition to the landlord's choice of a tenant, it nonetheless concludes that the prohibition is applicable to the instant case.

Section 37.2502(b), prohibits discrimination "against a person in the terms, conditions, or privileges of a real estate transaction." The franchise relationship, which is the product of an agreement drafted by defendant, involves a number of salient factors. Among these are the use by the franchisee of the franchisor's trademark and tradename, and the sale of franchisor's products by the franchisee. Amoco contends that these are in fact the salient and distinctive attributes of a franchise relationship. But Amoco also chose to include the lease of commercial real property as an additional incident of its franchise relationship with Ray Lucy. Without deciding whether the lease of the real property or the licensing of trademarks and tradenames is the more compelling inducement for a person to enter into a franchise relationship with an integrated oil company such as Amoco, the Court concludes that in this case the licensing constituted a "condition or privilege of a real estate transac-

tion" as that phrase is used in § 37.2502(b) of the Elliott-Larsen Act.

Defendant is the party responsible for linking the use of its trademark and goodwill with the leasing of commercial real property. It is no answer to this Court's application of the prohibition against discrimination to this kind of multi-faceted relationship to argue that the lease of the commercial property is only a minor incident of the franchise relationship, taken as a whole. Amoco has chosen to tie the licensing of its trademark and tradename to a leasehold interest. Having done so, its argument that it should not be subjected to the legitimate interests of the state to regulate such real property transactions rings hollow. If Amoco desires to carry out its franchising business unencumbered by valid state regulation of real property transactions, it can divest itself of its real property holdings. There is nothing inherent in the franchise relationship that requires an integrated oil company to stand in the position of a landlord with respect to its franchisees. Amoco could just as easily license the use of its trademark and tradename to persons who owned their own service stations, or who rented from third parties.

For the foregoing reasons, the motion to dismiss plaintiffs' claim for gender and age discrimination in violation of Article 5 of the Elliott-Larsen Act is denied.

*Defendant's Motion to Dismiss Plaintiffs' Claim for Tortious Interference with Prospective Business Advantage*

Amoco contends that plaintiffs' cause of action, if such existed, arose prior to September of 1976, and that it is now barred by operation of Michigan's statute of limitations for tort actions, which provides that such claims must be brought within three years of the date when the cause of action first accrues, M.C.L.A. 600.5805(8).[6]

---

**5.** Indeed, as defendant points out, the relationship between an integrated oil company and its franchisees is even more subtle and complex than that between ordinary business partners, because the interest of the oil company and the service station owner may at times diverge, as they apparently did in this case, *see* Jordan,

*Unconscionability at the Gas Station,* 62 Minn.L. Rev. 813 (1978).

**6.** Plaintiffs have not sought to characterize their claim as one for breach of contract, which is subject to the six-year period of limitations prescribed in M.C.L.A. 600.5807(8). It appears, however, that even the longer period of limita-

Although plaintiffs apparently concede that Amoco refused to purchase the automobile service equipment and permit Ray Lucy to operate the Hickory Farm franchise at the lease premises prior to September of 1976, they argue that the conduct of Amoco amounted to a continuous tort which persisted until the date of Lucy's death in 1982, and that the statute of limitations does not bar the claim. In support of this theory, plaintiffs state that Amoco sent Lucy a letter in 1978 indicating that the franchise agreement would be terminated in 1982; that James Baker, a representative of Amoco, brought a stenographer to a 1982 meeting with Lucy in contravention of the past practices of the parties; and that an unnamed Amoco agent referred to Lucy as the "most uncooperative dealer" among all of Amoco's franchisees (neither the date nor the context of this incident is given by the plaintiffs).

The Court concludes that, assuming the veracity of these allegations, plaintiffs have nonetheless failed to state a claim for tortious interference with prospective business advantage that is not barred by the statute of limitations. Plaintiffs are describing a series of discrete events which can be readily identified as to time of occurrence. Even assuming that these incidents were motivated by an underlying desire on the part of Amoco to interfere with Ray Lucy's business, the fact that the incidents were so motivated does not preclude operation of the statute of limitations with respect to each incident.

A similar claim as that raised by plaintiffs herein was advanced in *Vandenhout v. Manchester Plastics*, 538 F.Supp. 401 (E.D.Mich.1982). Vandenhout claimed that she had been paid less than her male counterparts who performed substantially similar work to that which she performed, and that this differential in wages constituted a violation of the Elliott-Larsen Act. This Court concluded that a cause of action accrued, for purposes of the statute of limita-

tions, each time that plaintiff received a paycheck, the amount of which was determined in part by a discriminatory motive. The Court further concluded that those claims relating to paychecks received prior to the three-year statutory period were barred by operation of the statute, but those relating to paychecks received within three years of the filing of the complaint were not barred, *id.* at 402.

■ Likewise in this case. Any overt conduct on the part of defendant which gave rise to a cause of action for tortious interference with prospective business advantage that occurred prior to September 27, 1979, is barred by operation of the statute of limitations. The fact that such conduct may have been motivated by policies or prejudices which continued to exist subsequent to that date, which policies may have motivated similar conduct within the statutory period for bringing claims, does not prevent application of the statute to the earlier claims. The pleading of an ongoing conspiracy is not necessary to the statement of a cause of action for tortious interference with prospective business advantage. The tort is complete upon a showing of the existence of a valid business relationship or the expectation of such a relationship between the plaintiff and some third party, knowledge of the relationship or expectation of the relationship by the defendant, and an intentional interference causing termination of the relationship or expectation which results in damages to the plaintiff, *Meyer v. Hubbell*, 117 Mich. App. 699, 324 N.W.2d 139 (1982). The cause of action accrues and the statute of limitations begins to run upon the simultaneous occurrence of each of the elements of the tort.

■ Consequently, plaintiffs' allegations that Amoco engaged in conduct within the period of limitations which interfered with Ray Lucy's prospective business advantage does not serve to permit the cause of action which may have accrued within the period

tions for contract claim does not reach back as far as the allegedly wrongful incident, which occurred prior to September of 1976. The com-

plaint in this case was filed on September 27, 1982.

of limitations to "relate back" to conduct which occurred outside of the period of limitations. Because the prior order of this Court limited plaintiffs' cause of action for tortious interference with prospective business advantage to only the 1976 incident, the Court holds that the entire claim is barred as untimely. The defendant's motion to dismiss the claim for tortious interference with business advantage is therefore granted.

SO ORDERED.